J-S05010-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| REBECCA WATKINS-LAUBER | : | |
| | : | |
| Appellant | : | No. 1323 EDA 2025 |
| | : | |

Appeal from the Judgment of Sentence Entered December 19, 2022
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0006906-2019

BEFORE:   PANELLA, P.J.E., KING, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.E.:                **FILED APRIL 21, 2026**

Rebecca Watkins-Lauber appeals *nunc pro tunc* from the judgment of sentence imposed on December 19, 2022, for her convictions of aggravated assault and conspiracy.[1] Watkins-Lauber challenges the sufficiency and weight of the evidence and the discretionary aspects of the sentence imposed. After careful review, we affirm.

The trial court set forth the relevant factual and procedural history:

**Facts**

The testimony established that [Watkins-Lauber] was married to Albert Lauber, with whom she had a child. The [victim], Nicole Jameson, had a romantic relationship with Mr. Lauber, and also had a child fathered by him. Ms. Jameson was not aware that Mr.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2702(a)(1) and 903(a), respectively.

Lauber was married to [Watkins-Lauber] until about three months after they started living together and she became pregnant. On January 27, 2019, at about 3:00 AM, Ms. Jameson was at an afterhours club with some friends, when she was approached by [Watkins-Lauber]. [Watkins-Lauber] and Ms. Jameson had an argument regarding Mr. Lauber, until someone pulled [Watkins-Lauber] away.

A short while later Ms. Jameson and her friends left the club and were outside waiting for one of the friends to pull the car around, when [Watkins-Lauber] came outside and started speaking to Ms. Jameson. Each time Ms. Jameson attempted to leave, [Watkins-Lauber] would come back and reengage her, prolonging the conversation. All this time [Watkins-Lauber] had her phone to her ear. Finally, Ms. Jameson and her friends left and got in the car. Ms. Jameson is white, her two friends are black.

Ms. Jameson entered the front passenger side of the car and lit a cigarette, at which point she became aware of a man leaning on the back of the car and refusing to move. One of Ms. Jameson's friends exited the vehicle to ask the man to move, then as the friend was getting back in the car, Ms. Jameson was shot in the back of the head, behind and slightly above her ear. She tried to get down on the floor and did not remember anything else until she arrived at the hospital. Ms. Jameson was transported to the hospital by responding police officers. Following the shooting Ms. Jameson was unable to walk without a walker. She underwent physical therapy for three months and was out of work for a year. As of the time of trial she still suffered from headaches from the injury.

The events inside and outside the club were captured on video, from cameras at the club and the deli near where the car was parked. Ms. Jameson did not know Ackerman (the co-defendant) and had never seen him. Mr. Ackerman is [Watkins-Lauber's] nephew.

The evidence established that before, during and after the shooting, [Watkins-Lauber] was on the phone with Ackerman. The phones of [Watkins-Lauber] and Ackerman were recovered from their homes by police detectives, pursuant to a search warrant. Phone communication records indicated that [Watkins-Lauber] and Ackerman had been in contact seven times prior to the shooting. The last call lasted 10 minutes, 46 seconds and spanned

from just prior to the shooting to shortly after the shooting. There were four subsequent calls between [Watkins-Lauber] and Ackerman.

The video evidence (C-60, consisting of synchronized video captions), established the following, in summary: At some point after phone calls from [Watkins-Lauber] to Ackerman took place, Ackerman arrived at the club. Before entering the club, he stopped by a parked car, withdrew a gun from his pocket, and placed it in the car's rear, driver's side wheel well. Upon entry, Ackerman sat next to [Watkins-Lauber], who had been waiting for him at the bar. [Watkins-Lauber] spoke to him for several minutes before she got up from the bar and went to the rear room, with Ackerman closely following, and spoke briefly with Ms. Jam[e]son, who was on her way out of the club. Ackerman continued into the rear room of the club while [Watkins-Lauber] followed Ms. Jam[e]son and her friends onto the sidewalk just outside the club. [Watkins-Lauber] talked to Ms. Jam[e]son and her friend while she had Ackerman on the phone much of the time. After some time, [Watkins-Lauber] re-entered the club, retrieved Ackerman from the rear room and whispered something to him as she ushered him out the front door of the club. Ackerman passed Ms. Jam[e]son on the sidewalk, returned to the parked vehicle where he had hidden the gun earlier, and retrieved the gun from the wheel well. [Watkins-Lauber went back outside and began speaking with Ms. Jameson again. Watkins-Lauber] was on the phone with Ackerman while she was speaking with Ms. Jam[e]son and others on the sidewalk. [Ackerman] followed Ms. Jameson and her friend to their car, with [Watkins-Lauber] behind him observing, before she went back into the club. Ms. Jam[e]son and her two friends entered a vehicle, with [Ms. Jameson] as the front passenger. They could not back out of the [parking] spot because Ackerman, still on the phone, was leaning on the car trunk. The rear passenger exited the car and asked him to move. As she re-entered the car, Ackerman walked up to the front passenger side of the vehicle where Ms. Jameson [was] seated and fired through the window before running off, with the phone still to his ear. [Watkins-Lauber] had been on the phone with Ackerman before, during and after the shooting, on a call lasting 10 minutes and 46 seconds.

**Procedural History**

- 3 -

[Watkins-Lauber] proceeded to a jury trial on October 18, 2022, along with her co-defendant, [] Ackerman. On October 21, 202[2], [Watkins-Lauber] was convicted of aggravated assault and conspiracy to commit aggravated assault. Sentencing was deferred for preparation of presentence and mental health reports.

On December 19, 2022, [Watkins-Lauber] was sentenced to 7 ½ - 15 years [of] incarceration on the aggravated assault conviction and a concurrent sentence of 7 ½ - 15 years [of] incarceration on the conspiracy conviction.

[Watkins-Lauber] filed a timely post-sentence motion on December 27, 2022, which [] was denied on December 30, 2022. A timely notice of appeal was filed on January 8, 2023.

An order directing the filing of a statement of matters complained of on appeal pursuant to Pa.R.A[].P. 1925(b) was filed on January 18, 2023.

[Watkins-Lauber] filed a timely Rule 1925(b) statement on January 24, 2023.

Trial Court Opinion, 7/14/23, at 1-4 (paragraphs reordered for ease of discussion; record citations and unnecessary capitalization omitted).

The trial court authored its Rule 1925(a) opinion on July 14, 2023. This Court affirmed the judgment of sentence on March 28, 2024, after finding all issues waived because her brief was "woefully underdeveloped." **Commonwealth v. Watkins-Lauber**, 317 A.3d 630, *3 (Pa. Super. filed March 28, 2024) (unpublished memorandum).

Watkins-Lauber filed a *pro se* Post-Conviction Relief Act ("PCRA") petition on November 21, 2024. Counsel was appointed and filed an amended petition raising the claim that appellate counsel was ineffective for waiving all issues on appeal. Watkins-Lauber sought reinstatement of her appellate rights

*nunc pro tunc.* The court granted this request on June 4, 2025. Watkins-Lauber filed a timely notice of appeal to this Court. The trial court did not order a new Rule 1925(b) statement. The court submitted a letter in lieu of a new Rule 1925(a) opinion, referring this Court to the prior Rule 1925(a) opinion dated July 14, 2023.

Watkins-Lauber raises three issues for our review:

1. Whether the evidence was insufficient as a matter of law as to aggravated assault and conspiracy[?]

2. Whether the verdict was against the weight of the evidence[?]

3. Whether [Watkins-Lauber's] sentence was unduly harsh and unreasonable[?]

Appellant's Brief, at 7 (reordered for ease of disposition; unnecessary capitalization and lower court answers omitted).

We begin with our scope and standard of review regarding sufficiency of the evidence claims:

The standard we apply in reviewing the sufficiency of the evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the factfinder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the factfinder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the factfinder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be

considered. Finally, the finder of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Murray*, 350 A.3d 258, 262-63 (Pa. Super. 2025) (brackets and citation omitted).

Watkins-Lauber was convicted of conspiracy to commit aggravated assault and aggravated assault.

In order to prove the existence of a criminal conspiracy, the Commonwealth must demonstrate that the defendant: (1) entered an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and, (3) an overt act was done in furtherance of the conspiracy.

As conspiracy is itself a substantive crime, a defendant may be convicted of both conspiracy and the offense that was the object of the conspiracy.

The essence of a criminal conspiracy, which is what distinguishes this crime from accomplice liability, is the agreement made between the co-conspirators. It is essential that the co-conspirators have a shared criminal intent. The agreement must rest upon the mutual specific intent to carry out a particular criminal objective.

\*\*\*

Given the nature of a criminal enterprise, the Commonwealth may rely upon circumstantial evidence to prove the existence and scope of the agreement, as it rarely will have direct evidence to support that element of the offense. While the Commonwealth must show more than mere association, it may inferentially establish the conspiracy by the relation, conduct or circumstances of the parties, combined with the overt acts on the part of co-conspirators.

*Commonwealth v. Wellman*, 344 A.3d 13, 19 (Pa. Super. 2025) (citations, internal quotation marks, and brackets omitted).

Clearly, Watkins-Lauber did not pull the trigger on the firearm. She was convicted of aggravated assault either because she conspired with Ackerman to commit aggravated assault or she was an accomplice of Ackerman's. The trial court gave the jury instructions on both conspiracy and accomplice liability. Accomplice liability has been described as follows:

> [A] person may also be liable for crimes of another if he served as an accomplice. A person acts as an accomplice when he, with the intent of promoting or facilitating the commission of an offense[,] solicits such other person to commit it, or aids or agrees or attempts to aid such other person in planning or committing it. The amount of aid necessary is minimal. Indeed, the least degree of concert or collusion in the commission of the offense is sufficient to sustain a finding of responsibility as an accomplice. No agreement is needed, only aid.

*Commonwealth v. Reed*, 347 A.3d 795, 802 (Pa. Super. 2025) (citations, quotation marks, and ellipsis omitted).

"A person is guilty of aggravated assault if he … attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" 18 Pa.C.S.A. § 2702(a)(1).

Watkins-Lauber contends that the Commonwealth failed to prove she conspired with Ackerman because of a faulty time stamp on one of the many surveillance videos used during trial. *See* Appellant's Brief, at 22-23. However, Watkins-Lauber concedes that "the conversations between [Watkins-Lauber] and Mr. Ackerman, when viewed in the light most favorable to the Commonwealth, could alone lead a fact-finder to believe that they were

conspiring to commit assault." *Id.* at 23. Watkins-Lauber then asks this Court to look at the other evidence and give it more weight to find that the conversations did not establish a conspiracy. *See id.* Watkins-Lauber focuses heavily upon the faulty time stamp and asserts the jury did not have enough evidence to find Watkins-Lauber and Ackerman were on the phone during the shooting. *See id.* at 24-25. We disagree.

As Watkin-Lauber concedes, we view the evidence in the light most favorable to the Commonwealth in a sufficiency review. The evidence established Watkins-Lauber confronted the victim at the after-hours club. *See* N.T. Trial, 10/18/22, at 64. A verbal conflict ensued until someone pulled Watkins-Lauber away from the victim. *See id.* Later, Watkins-Lauber approached victim when she was trying to leave the club. *See id.* at 66. Once the victim finally got away from Watkins-Lauber, Ackerman went to the car the victim entered and leaned on the back of it. *See id.* at 67. Ackerman then walked to the passenger side of the car and shot the victim in the head. *See id.* at 68-69. Ackerman is Watkins-Lauber's nephew. *See id.* at 128.

Detective Thorston Lucke testified to his creation of the video compilation to walk the jury through what happened at relevant time periods. Detective Lucke explained he knew about the faulty time stamp. *See* N.T. Trial, 10/19/22, at 154-155. Detective Lucke put the events on the videos in chronological order "and it was very clear to discern events as they moved from place A to place B." *Id.* at 155. Detective Lucke explained the faulty time

stamp "was taken into consideration, and the events are clearly discernable from both camera angles." *Id.* The jury therefore heard about the faulty time stamp, saw the videos, and was able to make its own determination regarding whether the faulty time stamp affected the timing of the events.

Viewed in the light most favorable to the Commonwealth, as we are required to do, there was sufficient evidence to find Watkins-Lauber both conspired with Ackerman and aided him as his accomplice. The circumstantial evidence established Ackerman did not know the victim and had no reason to shoot her, but Watkins-Lauber did have motive to harm the victim. Ackerman is Watkins-Lauber's nephew and arrived at the club with a firearm, after talking on the phone with Watkins-Lauber. He then used that firearm to shoot the victim in the head. We therefore find Watkins-Lauber's first issue is meritless.

Next, Watkins-Lauber claims the verdict was against the weight of the evidence, again focusing heavily upon the faulty time stamp on the video. *See* Appellant's Brief, at 14-15. She further asserts the verdict is against the weight of the evidence because the victim told police she believed her child's father, Mr. Lauber, had something to do with her shooting. *See id.* at 16.

Weight of the evidence claims are addressed to the sound discretion of the trial court.

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an

appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interests of justice.

In order for an appellant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court. Additionally, this Court cannot substitute its credibility determinations for that of the factfinder or reweigh the evidence.

***Commonwealth v. Bernarsky***, 348 A.3d 304, 323 (Pa. Super. 2025)

(citations and quotation marks omitted).

The trial court here found:

[T]he evidence of the synchronized videos, the phone calls, the arrival and interaction between [Watkins-Lauber] and Ackerman, [Watkins-Lauber's] behavior in relation to the [victim], and the fact that Ackerman, the shooter, was [Watkins-Lauber's] nephew, who had never had contact with the victim, all come together to demonstrate a plot orchestrated by [Watkins-Lauber] to shoot Ms. Jameson. The evidence is not speculative or based on unwarranted assumptions. To the contrary, it is tight, consistent and readily sufficient to establish [Watkins-Lauber's] guilt.

***

As noted above, the circumstantial evidence inexorably demonstrated the plot to shoot Ms. Jameson, and [Watkins' Lauber's] role in orchestrating the shooting.

Having observed the witnesses and the video, as well as the phone evidence, the court's conscience is not at all shocked by the verdicts. To the contrary, the verdicts are wholly consistent with the overwhelming weight of the evidence.

Trial Court Opinion, 7/14/23, at 6-8.

After our review of the record, we cannot find the trial court abused its discretion. As noted above, the evidence established Watkins-Lauber conspired with Ackerman to assault the victim. Watkins-Lauber prevented the victim from leaving so that Ackerman could then shoot her. Watkins-Lauber's second issue does not merit relief.

Finally, Watkins-Lauber asserts the trial court abused its discretion in sentencing her to an unduly harsh and unreasonable sentence. **See** Appellant's Brief, at 18. This is a challenge to the discretionary aspects of the sentence imposed.

> Challenges to the discretionary aspects of sentencing do not entitle an appellant to an appeal as of right. Prior to reaching the merits of a discretionary sentencing issue, we conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, **see** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, **see** Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, [**see**] Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, [**see**] 42 Pa.C.S.A. § 9781(b).

**Commonwealth v. Hill**, 348 A.3d 264, 286-87 (Pa. Super. 2025) (brackets and citation omitted).

Watkins-Lauber filed a timely notice of appeal, preserved her claims in a post-sentence motion, and included a Rule 2119(f) statement in her brief. We therefore determine whether she has raised a substantial question.

"To establish a substantial question, the appellant must show actions by the trial court inconsistent with the Sentencing Code or contrary to the

fundamental norms underlying the sentencing process. The determination of whether a particular case raises a substantial question is to be evaluated on a case-by-case basis." *Id.* at 287 (brackets and citation omitted).

Watkins-Lauber alleges her sentence is harsh and unreasonable because the "sentencing judge did not consider all the mitigating factors[.]" Appellant's Brief, at 11. She claims the mitigation factors which were not considered included "the prior record offense score of a true zero, her reputation as an outstanding mother, the plethora of commun[ity] support [she] retains, and her long-standing history of being an upstanding citizen in her community." *Id.*

This Court continues to hold that "a claim of inadequate consideration of mitigating factors does not raise a substantial question for our review." *Hill*, 348 A.3d at 287 (citation omitted). We therefore find that Watkins-Lauber has failed to raise a substantial question for our review.

Even if Watkins-Lauber did raise a substantial question for our review, however, her claim would not entitle her to relief. Watkins-Lauber alleges the trial court did not consider her "situation, history, and character" and that she has witnesses willing to testify on her behalf. Appellant's Brief, at 20. She concedes that the trial court stated that it considered her prior record score, specific circumstances of the case, and other mitigating factors. *See id.* However, she believes the trial court did not adequately consider them

- 12 -

because she should have been sentenced to a guideline or mitigated range sentence. *See id.* at 20-21. We disagree.

Our long-standing standard of review is as follows:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Campbell*, 347 A.3d 707, 717 (Pa. Super. 2025) (citation omitted). Furthermore, we note the well-established principle holding, "[w]here the trial court has the benefit of a [pre-sentence investigation ("PSI")] report, we shall presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Hill*, 348 A.3d at 287 (citation, ellipsis, and internal quotation marks omitted).

The court here had not only the benefit of a PSI report, but also a mental health report. *See* N.T. Sentencing, 12/19/22, at 5. The court heard from counsel for both parties before imposing its sentence and then provided its reasons on the record:

[The trial court] has considered the mental health evaluation reports, sentencing guideline forms, the presentence report, the arguments of all counsel, and the particular circumstances of this offense. One has to wonder if the culpable conduct here is the kind of cruelty that Ms. Watkins-Lauber was akin to, notwithstanding her lack of record, or whether this is abhorrent behavior outside of her normal character. I'll be guided by the record before me

and take it as an isolated occurrence. Unfortunately, even taking it as such, her conduct demonstrates a depravity of heart that indicates that she poses a danger to society and cannot be ignored. Further, the impact on the victim is no small thing. Again, the victim is forever compromised physically, mentally, and emotionally.

I do agree with the Commonwealth that this event would not have happened without her involvement, her direct solicitation. As such, the guidelines somewhat under-represent the seriousness of her culpable conduct. Even if she had called Mr. Ackerman to, quote/unquote, fuck her up, one cannot assume, given everything that we know, that that would have constituted a slap on the wrist.

[The trial court] does recognize that she is a true zero in terms of criminal history and that she has family support and [the trial court] recognizes the damage to her family structure that is collateral and resulting from her conduct, but given the nature of that conduct and the threat that it poses to society and in no small part the effect that it caused upon the victim, it is difficult to make this a standard guideline sentence, so I won't.

*Id.* at 62-63.

We cannot find any abuse of discretion in the sentence imposed. Ackerman did not know the victim and as the trial court aptly notes "this event would not have happened without [Watkins-Lauber's] involvement[.]" *Id.* at 62. The sentence imposed is not unreasonable given the fact that Watkins-Lauber was the precipitating event that caused the victim's injuries. Therefore, even if Watkins-Lauber did raise a substantial question, her final issue would not entitle her to relief. As such, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>4/21/2026</u>